Judge Underwood
delivered the opinion of the Court
Briscoe, as the assignee of Moore, obtained a judgment against S. Casey and his surety Givens; for the amount of which they entered into a recognizance, payable in three months, with P. Casey and Taylor, their sureties.
On the 3d of December, 1822, an execution issued upon the recognizance endorsed, that notes' on the banks of Kentucky and of the Commonwealth of Kentucky, would be received in payment, and which was levied on some personal property, 7 lots in Morgan-field, and 25 acres of land, adjoining the property of S. Casey, and 1000 acres, and 600 acres of land, the property of P. Casey. Blue, the deputy sheriff, into whose hands the execution was placed, returned that he “had advertised and sold, on the 24lh of Februar}’, 1823, all the personal properiy,except the house; and the sale slopt by order of plaintiff’’s attorney.”
From the evidence in the case, it appears that S. Casey got Hughes to go from Union to Mercer, about the time the execution issued, for the purpose-of procuring some indulgence for the payment of part of the debt. Mr. Hughes, on reaching Harrodsburg, saw Moore, the assignor, who informed him that Bris-coe had no longer any interest in the debt, (which Briscoe afterwards confirmed) and that the debt belonged to him, Moore. That he, Moore, wa-sindebted to a firm in Philadelphia, and could make no arrange *530 ment so as to give indulgence, without the consent'of T. M. Bryan, one of the firm, then in Lexington. Hughes went to Lexington, saw Bryan, agreed on a meeting thereafter in Harrodsburg, where they accordingly met, when the following arrangement was-made: Bryan, on his part, upon returning to Lexington, agreed to leave with John W. Hunt, an order on Moore, in favor of Hughes for $3000, and to instruct Hunt to deliver the order to Hughes upon his giving to Hunt a note, with appoved security, for the amount with interest, calculated from 20th Jan. 1823. The note to-be executed for specie in the ensuing May, payable fifteen months thereafter, &c. Hughes did not give his unqualified assent to comply with Bryan’s proposition, because he did not know whether the parties for whom he was negotiating could give-the security required at Lexington. Upon this conditional agreement, as it is called by Hughes, he says Moore gave him a letter to Wm. Grundy, who was the attorney at law for Briscoe in obtaining the judgment, the precise terms of which, Hughes says he does not recollect; but believes that it was in substance, a direction for Grundy, in consequence of an arrangement made between him (Moore) and Hughes to slay the execution, until his (Moore’s) further order.”
Hughes stales, that after he left Moore at Spring - field, he informed Elias Pavidson of his object, and as he doubted whether the arrangement with Bryan could be accomplished, he agreed with Davidson, “if he would advance $2000, that it should be paid by , the defendants in specie,.within two years; that they 'would confess judgment for that sum, at the ensuing March term, and that the execution upon the judgment so confessed, should be stayed for such a period of time, as would enable him to collect the same within two years, or that they should execute their note, payable in specie, at such a period as would enable him to bring suit and collect the same, within the two years.”
Hughes says, that Davidson, therefore, drew a check upon the Springfield branch bank, for $2000, and enclosed it in a letter to S. O. Brown, his son-in-law, in which letter, the contract between “me, (Hughes] as *531 the agent for said defendants in said execution, and said Davidson was set forth.”
Hughes upon his return to Union informed S. Casey what he had dene. On the day of sale, Brown was sent for, and Davidson’s letter delivered to him, and at the same time, Moore’s letter to Grundy was delivered.
Hughes states that Givens never gave him any au‘ thority to make an arrangement or contract with Da* vidson, and that Givens never agreed to the contract or arrangement, as made, to his knowledge.
On the day of sale, Wm. Grundy, as attorney for the plaintiff made an endorsement upon the back of the execution which Blue had levied, transferring to Elias Davidson $2000 thereof, and added these words: “and do hereby give him full power to have the same managed so as to recover said amount.” (Signed) Wm. Grundy, attorney for plaintiff. Upon this transfer being made, Brown delivered Davidson’s check to G rundy,and agreed, as S. Casey states, (whose deposition has been read without exception) that if S. Casey and Givens would carry into execution the understanding between Davidson and Hughes, that the sum of $2000 should be credited on the execu? tion. After this, the deputy sheriff proceeded to sell Ml the personal property except the house.
Blue, the deputy sheriff, states that his sales of the personal property, amounted to $120 or $130, and he was crying the lots when the sale was stopped by William Grundy, the plaintiff’s attorney. Upon cross examination, it very satisfactorily appears, that Grundy gave no directions to Blue, as to the $2000. which had been by him transferred to Davidson, and that h<i only directed Blue to stay execution or suspend th& sale as to the balance due, after deducting the said $2000. Blue stopped the sale, and made the return already stated. Thereafter, the balance of the property levied ony was sold •, a writ of vendí. expo, having issued.' The debt not being paid a fi.Jia. issued, and was levied on the property of Givens, who injoined, insisting that he was released and discharged from further liability, he being but the surety in consequence of the arrangements aforesaid.
The cases are nufnerous, in which sureties havebeendis-charge<l;from-liability, in' consequence of arrangements made with the principal, to their prejudice, b'y the obligee or as-signee, or person equitably entitled to the demand.-
Attorney at law, has not, in virtue ef his office, power to release the sureties of the principal debtor, from havebeen”3*' employed to collect a debt or d.° any act have that ef-feet to his f11®.111’8 Pre‘ *
*532 The circuit court dissolved the injunction, and dismissed the bill; to reverse which decree Givens has appealed.
The cases in which sureties have been discharged from liability, in consequence of arrangements made to their prejudice by the obligee or assignee, or person equitably entitled to the demand with the principal debtor, and without the knowledge or consent of the surety are numerous. Those which have been adjudgedinourowncourt,and in other tribunals which lay down the principles upon which relief is granted, and which are deemed of most importance, in settling the principles and reasons of the law, applicable to this branch of jurisprudence, are referred to in the case of Sneed’s ex’r. vs. White, just decided.
Applying the doctrines of the law, to the facts of this case, we concur with the circuit court. The conditional arrangement, made by Hughes with Bryan, was never executed. It does not appear that Mbore was ever informed by Hughes, or any other, that Davidson would advance $2000, in notes on the bank of the commonwealth, upon the terms, and with a view to effectuate the agreement with Davidson, spoken of by Hughes. On the contrary, it is to be inferred conclusively, from the testimony of Hughes, that Moore was ignorant of the arrangement entered into between Hughes, acting for Casey, and the other defendants in the execution and Davidson. Moore’s letter, therefore, to Grundy, must have been based entirely upon the conditional arrangement made with Bryan. This letter contained the authority, if any was ever given, by which Grundy was authorized to stay the execution; which stay of execution, constitutes the basis of the appellant’s equity. If Grundy acted without express authority, we are of opinion that his acts could not prejudice Moore or Davidson.
An attorney at law has not, in virtue of his office, power to release the sureties of the principal debtor, from whom he may have been employed to collect a debt, or to do any act which would have that effect, to his client’s prejudice. We cannot, from the testimony in this cause, determine that Moore’s letter vested Grundy with any such power. ,
Theequitable owner of the debt, is ne-toMlfby3^ surety’paying tobereieased, ^dul/renoe0^ granted to debtor,
Hughes, the only witness who speaks of the contents of the letter, says he does not recollect its precise terms. It is true, that he expresses his that in substance, it directed Grundy to stay the execution until the further order of Moore, “in conse-quenóe of an arrangement made between him and Hughes.” Now, in fact, there never wasany arrange-merit made between Moore and Hughes, as the depo-sipón oi the latter proves. 1 he conditional arrange-raent made with Bryan, was not regarded by Hughes, who made it, as one likely to be carried into effect; and therefore, he entered into the arrangement with Davidson, of which Moore remained uninformed. It' is not probable, under these circumstances, that Moore would have interfered to stay thp execution, and thereby, to jeopard the safety of the debt, when no arrangement had, in fact, been made, and when the conditional arrangement with Bryan, the only one of, which he had'knowledge, was one that Hughes, the agent for making it, on the part of the defendants in execution, had no confidence in; and hence, could not, as an honest man, desire Moore to rely on it for fulfilment. We require something stronger than the belief of the witness as to the contents of the letter, especially as it is not shown why the letter was not produced, or its absence accounted for. If the letter contained an authority to Grundy, it is most likely that he would have preserved it for his justification, it is fair to presume that it vvas accessible. But again, the answers of Briscoe and Davidson, admit nothing favorable to the appellant’s allegations, and Hughes is the otily witness, who in, the least proves that Moore gave authority to Grundy.
This authority having been derived, if it exists, from Moore, who is proved by Hughes, to be the equitable holder of the debt against Casey, &c. shews that Moore was an indispensible party. He was deeply interested, and should have been called on to answer the allegations, in respect to the contents his letter. This was not done. If he had been made a party, and had denied giving authority to Grundy to stay the execution until further orders, Hughes’ sition alone, coukl not have operated against his answer, even if Hughes had distinctly recollected the *534 contents of the letter, and had stated positively, that it required Grundy to stay the execution. But if we wcre concecje that Grundy had authority to stay the execution, yet it is believed that he never did it, nor did he direct the sheriff to do if, so far as it regards the $2000, claimed by Davidson. The endorsement made by Grundy, transfering that sum to Davidson, shows that Davidson was to control the execution, so far as it related to the collection thereof. This, in connexion with the proof,shows that-Grundy only controlled the execution, and directed the sheriff to stay it, for the balance due, after deducting the amount endorsed to Davidson’s benefit. This balance was owned by Moore in equity, and if Moore, by his agent or attorney, stayed the execution to the prejudice of the appellant, it might be ground for exonerating him from liability .to Moore, but upon no prin-' ciple known to us, could Moore’s conduct operate to release the appellant from his liability to others, equitably entitled to a part of the same execution. Bris-coe \Vas the plaintiff at law, and he never interfered to exonerate the appellant. If, then, Grundy acted throughout, in pursuance of authority given him by Moore, when $2000 of the execution was transferred to Davidson, the control of the execution, for that sum, was also given to Davidson, and neither Moore, nor his attorney Grundy, could thereafter give obligatory instructions to the sheriff, as to the management' of the execution, iu relation to the $2000. If the sheriff has obeyed their instructions, he has done it at his peril, and neither his conduct or theirs, ought to deprive Davidson ot ins right to use the execution for the purpose of collecting the proportion of the debt he is entitled to. .
if one of several equitable owners of an execution, indulge principal to preju-diceof surety, it might be ground to exonerate surety, to extent of his interest in the execution, but would not release surety from his liability to the other equitable owners of the execution.
It is manifest, that Davidson advanced depreciated bank notes, with a view to convert them into lawful coin, under a promise from Hughes, actingin the behalf of the defendants in the execution, that they would complete the arrangement contemplated. Givens, however, refused. ' Neither Givens nor Davidson was present on the day of sale, when Grundy made the endorsement and transfer of ‡2000 on the execution, to Davidson, and thereafter stayed the execution for the balance. No one then present, had authority to *535 bind Givens to enter into the contemplated arrange-meat and settlement, and no one then present, had authority to stay the execution, so far as Davidson was interested in it. The friends of the parties, supposed that the contemplated arrangement, would thereafter he carried into effect, and hence, they winked at the suspension of the sale by the sheriff. Givens has refused to execute the arrangement, and now asks to be discharged altogether: but in this he cannot be gratified, for the reasons already suggested. Davidson’s object was to convert a depreciated currency into lawful money, by gelling clear of the endorsement on the execution, under a new, contract, but his project also failed.
Danny and Criilenden fov appellant; Wickliffe, Woo-ley, C. Wickliffe, and Hardin, for appellees.
The decree of the circuit court is affirmed with costs and damages.